UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ELIZA WILLE<br>75-5595 Mamalahoa Highway<br>Holualoa, HI 96725<br><br>SHELLEY CAREY<br>PO Box 1359<br>Kailua-Kona, HI 96745<br><br>LISA DENNING,<br>PO Box 1041<br>Kealakekua, HI 96750<br><br>         Plaintiffs,<br><br> v.<br><br>GINA RAIMONDO, in her official capacity as<br>Secretary of Commerce<br>1401 Constitution Ave., N.W.<br>Washington, DC 20230<br><br>NATIONAL MARINE FISHERIES SERVICE<br>1315 East-West Highway, 14th Floor<br>Silver Spring, MD 20910<br>Maryland County: Montgomery<br><br>RICHARD SPINRAD, in his official capacity<br>as Administrator of the National Oceanic and<br>Atmospheric Administration<br>1401 Constitution Ave., N.W., Room 5128<br>Washington, DC 20230<br><br>JANET COIT, in her official capacity as<br>Assistant Administrator for Fisheries<br>1315 East-West Highway, 14th Floor<br>Silver Spring, MD 20910<br>Maryland County: Montgomery<br><br>         Defendants. | No. 8:22-cv-689<br><br>**COMPLAINT** |

## INTRODUCTION

1.      The natural resources of Hawaii are renowned for their beauty, diversity, and accessibility. Their presence is so central to Hawaii's identity and economy that the state constitution forbids *not* making reasonable use of these resources. *See Kauai Springs, Inc. v. Planning Comm'n of Cnty. of Kauai*, 133 Haw. 141, 172 (2014); *In re Water Use Permit Applications*, 94 Haw. 97, 141 (2000).

2.      Among Hawaii's popular attractions are spinner dolphins, a playful, social animal that often seeks out human encounters in nearshore waters. In turn, a productive industry of boat captains and dolphin guides has sprung up to introduce locals and tourists alike to the experience of being approached by and swimming with these gregarious marine mammals. These dolphins have also played a key part in some psychotherapy practices, which have found that dolphin-based experiential therapy can have a profound impact on those struggling with mental illness.

3.      Last September, however, this fruitful and mutually beneficial relationship between humans and dolphins was destroyed.

4.      The cause is a rule adopted by the Deputy Assistant Administrator for Regulatory Programs ("DAARP"), an employee at Defendant National Marine Fisheries Service ("NMFS"). *See Swim With and Approach Regulation for Hawaiian Spinner Dolphins Under the Marine Mammal Protection Act*, 86 Fed. Reg. 53,818 (Sept. 28, 2021) ("Rule"). Effective October 2021, the Rule permanently banned swimming with or approaching Hawaiian spinner dolphins—not because spinner dolphins are in decline, or because there are any confirmed negative impacts of

swimming with them. Rather, the DAARP concluded that allowing people and dolphins to swim with each other may lead dolphins to expend energy that they really ought to spend caring for their young and eating their food—a state of affairs that the employee decided was illegal "harassment" of the dolphins. *Id.* at 53,819.

5.    Plaintiffs are among the boat captains, guides, and mental health professionals whose professional lives and personal finances have been upended by the Rule. Plaintiffs challenge the Rule as a violation of the Appointments Clause. Under that structural provision of the Constitution, officials who possess significant federal power, including rulemaking power, must be appointed as "Officers of the United States." *Buckley v. Valeo*, 424 U.S. 1, 140–41 (1976) (per curiam). Officers must be appointed by the President with the advice and consent of the Senate, except that Congress may by law vest the appointment of "inferior" officers in the President alone, the courts of law, or the heads of departments. U.S. Const. art. II, § 2, cl. 2. These limitations make the President responsible for the selection and oversight of executive officials with significant power, and the American people can then hold him responsible for poor appointments.

6.    The DAAARP, Samuel Rauch, is a career civil servant. As a career employee, Mr. Rauch was not appointed pursuant to the Appointments Clause. Yet he holds vast rulemaking power as the official at NMFS in charge of regulations and policymaking. As a result, Mr. Rauch holds his post unconstitutionally and lacked the power to adopt the Rule. The Rule must therefore be vacated.

7.    Plaintiffs also challenge the agency actions by which Mr. Rauch came to possess his authority over Plaintiffs. Mr. Rauch's rulemaking power was not vested in his post by statute but by a chain of departmental delegations of authority. But because the Appointments Clause does not permit non-officers to be vested with rulemaking authority over Plaintiffs and other individuals, the delegations are unconstitutional and must be vacated.

## JURISDICTION AND VENUE

8.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); *id*. § 2201 (authorizing declaratory relief); *id*. § 2202 (authorizing injunctive relief); and 5 U.S.C. §§ 701–06 (judicial review provisions of the Administrative Procedure Act).

9.    Venue in the District of Maryland is proper because the offices of the Defendants are located within the district, and a substantial part of the acts or omissions giving rise to this action occurred within the district. 28 U.S.C. § 1391(e).

## PARTIES

### *Plaintiffs*

10.    Eliza Wille, Shelley Carey, and Lisa Denning are Hawaii residents and participants in commercial or professional activities directed toward Hawaiian spinner dolphins.

11.    Eliza Wille is a psychotherapist, with a master's degree in psychology from the London School of Economics and a bachelor's degree in psychology from the University of Hawaii. Her career has included eight years participating in cognition

research on dolphins. Most recently, Eliza conducted her psychotherapy practice at Hawaii Island Recovery, a small residential treatment center on Kona Island that focuses on substance abuse, addiction, and related mental disorders. Eliza's practice focuses on experiential therapy, rather than talk therapy. Experiential therapy places clients in unfamiliar situations that surface strong emotions, which the therapist and client then discuss and process together. This form of therapy—which includes art, nature, and equine therapy—is especially helpful for those who have difficulty surfacing or grasping their emotions by themselves in a traditional talk-therapy setting. Eliza started employing dolphin encounters in her experiential therapy 10 years ago. In her experience, dolphin encounters have been a powerful part of her practice, creating turning points for many patients' mental health journeys. The encounter can bring to the surface anxiety and feelings of being overwhelmed and losing control in Eliza's patients, which she can then help them process and overcome. In learning to manage these emotions in the context of a dolphin encounter, Eliza's patients also learn to manage their emotions in everyday contexts. The Rule prevents Eliza from offering this key part of her psychotherapy practice. Shortly after the Rule went into effect, Eliza was furloughed by Hawaii Island Recovery, as the clinic continued to grapple with the COVID-19 pandemic. Eliza continues to work toward other opportunities to conduct her practice, including building a private practice. But so long as the Rule stands, Eliza will be unable to offer dolphin encounters as part of her practice, whether at Hawaii Island Recovery or in private practice.

12.     Shelley Carey is the owner of Merrill Inc. d/b/a Dolphin Discoveries and a boat captain in Hawaii. Dolphin Discoveries has been offering dolphin swims and other marine experiences since 1999; Shelley purchased the company in 2019. After the Rule went into effect, Dolphin Discoveries stopped offering dolphin swims. As a result, the company's revenue dropped by one-third, even after the company pivoted to providing dolphin watches from a distance. In addition, by banning a popular aquatic activity, the Rule reduces the value of Shelley's transferrable boating permit. Shelley, on behalf of an industry association, submitted comments opposing the Rule by email to the Regional Administrator for NMFS's Pacific Islands Regional Office in August 2021.

13.     Lisa Denning is a marine mammal naturalist who has worked with dolphins in multiple capacities. Lisa was a dolphin guide in Hawaii; she would lead her own clients out to spinner dolphins on chartered boats and show her clients how to interact with the dolphins respectfully. She also contracted her services to vessels with their own clients. Lisa is also an ocean photographer and videographer; her work with dolphins and whales supplemented her income. Since the Rule went into effect, Lisa's income has fallen by approximately 90%. In addition to her guide and camera work, Lisa co-founded the Light ON Foundation, which she runs in partnership with a licensed trauma therapist. The Light ON Foundation is a donor-funded nonprofit that provided survivors of sexual assault and domestic violence with free dolphin-centered experiential psychotherapy, as well as other types of therapy. The Light ON Foundation continues to operate, but the Rule has prevented the nonprofit and Lisa

from offering their primary mode of therapy. Lisa submitted comments opposing the Rule by email to the Regional Administrator for NMFS's Pacific Islands Regional Office in August 2021.

14.    Each Plaintiff had always interacted with dolphins respectfully and taught their clients to do the same. Plaintiffs and their clients would take a vessel out onto the water in the early morning and maneuver alongside a pod of dolphins. If the dolphins were already inactive or resting, Plaintiffs and their clients would simply watch from the vessel. If the dolphins were active, Plaintiffs and their clients would gently enter the water, and wait for the dolphins to approach.

15.    Eliza and Lisa would then allow their clients to swim amongst the dolphins in a slow, relaxed manner, with their arms at their sides or behind their backs. They did not reach out to the dolphins with their hands or chase them. During Eliza's sessions, she would also help her clients process and manage their emotions while they interacted with the dolphins. Eliza and Lisa and their clients were always out of the water by mid- to late-morning, to give the dolphins time to rest.

16.    Shelley and his clients were even more limited in their interactions with the dolphins. His clients were taught simply to let the dolphins swim by them, and they were out of the water by 10 a.m.

17.    None of the Plaintiffs have been cited for harming or harassing dolphins or other wildlife.

*Defendants*

18.     Gina Raimondo is the Secretary of Commerce and the official charged by law with administering the relevant portions of the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 *et seq.* ("Act"). She is sued in her official capacity only.

19.     The National Marine Fisheries Service is an agency within the National Oceanic and Atmospheric Administration ("NOAA"). NOAA is an agency within the Department of Commerce.

20.     Richard Spinrad is the Administrator of NOAA. He is sued in his official capacity only. The Secretary of Commerce has delegated to the NOAA Administrator the authority to administer the relevant portions of the Act.

21.     Janet Coit is the Assistant Administrator for Fisheries and the head of the National Marine Fisheries Service. She is sued in her official capacity only. Ms. Coit was appointed to her position on June 21, 2021. The NOAA Administrator has sub-delegated his authority under the Act to the Assistant Administrator for Fisheries. The Assistant Administrator has further sub-delegated rulemaking authority under the Act to NMFS's Deputy Assistant Administrator for Regulatory Programs.

## LEGAL BACKGROUND

### *The Marine Mammal Protection Act*

22.     Congress passed the Marine Mammal Protection Act because "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic." 16 U.S.C. § 1361(6). To protect these

values, marine mammals are to be regulated pursuant to "sound policies of resource management." *Id.* In particular, marine mammals that are "in danger of extinction or depletion" should not be allowed to "diminish" beyond their "optimum sustainable population" or "the point at which they cease to be a significant functioning element in the ecosystem." § 1361(1)–(2).

23.     In furtherance of these goals, the Act creates a "moratorium on the taking and importation of marine mammals and marine mammal products," § 1371(a), but empowers the Secretaries of Commerce and Interior to make exceptions to the moratorium, § 1371(a)(1)–(3), (5).

24.     "Take" is defined to include actions "to harass . . . or attempt to harass . . . any marine mammal." § 1362(13). And "harassment" is defined to "mean[] any act of pursuit, torment, or annoyance which—(i) has the potential to injure a marine mammal or marine mammal stock in the wild; or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns[.]" § 1362(18)(A).

25.     Regulations further define "take" to include "the doing of any . . . negligent or intentional act which results in disturbing or molesting a marine mammal." 50 C.F.R. § 216.3.

26.     The Act empowers the Secretaries of Commerce and Interior to issue regulations that are "necessary and appropriate to carry out the purposes of" the Act. 16 U.S.C. § 1382(a).

27.    The Act splits responsibilities for its administration between the Secretaries of Commerce and Interior. § 1362(12). The Secretary of Commerce ("Secretary") is responsible for duties under the Act relating to spinner dolphins and other cetaceans. *Id.*

### *The Delegations of Authority and the Deputy Assistant Administrator for Regulatory Programs*

28.    The Secretary of Commerce has delegated her powers under the Act to the NOAA Administrator. In turn, the NOAA Administrator has sub-delegated those powers to the NMFS Assistant Administrator.

29.    The NMFS Assistant Administrator has further sub-delegated her rulemaking powers under the Act to the NMFS Deputy Assistant Administrator for Regulatory Programs. The DAARP may exercise these rulemaking powers without the concurrence of the Assistant Administrator or other more senior officials.

30.    The DAARP is one of three senior positions within NMFS that report to the Assistant Administrator.

31.    The DAARP manages policy and regulations within NMFS. As part of this work, he oversees NMFS's Office of Protected Resources, which assists the DAARP in administering his responsibilities under the Act. The DAARP also oversees NMFS's Office of Sustainable Fisheries, Office of Habitat Conservation, and NMFS's various regional offices.

32.    The other senior positions are the Deputy Assistant Administrator for Operations, who manages NMFS's budget and enforcement efforts, and the Director

of Scientific Programs and Chief Science Advisor, who manages NMFS's scientific work.

33.    The current DAARP is Samuel Rauch. He has held the position since 2006. Mr. Rauch is a career member of the Senior Executive Service. On information and belief, he was not appointed by the President, a court of law, or a head of department. Rather, as a career civil servant, he was hired as an employee through a civil-service staffing process, and he enjoys civil-service protections.

34.    Mr. Rauch approved the final rule for publication in the Federal Register.

### *The Appointments Clause*

35.    The Appointments Clause of the United States Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. This requirement applies to both noninferior (also called principal or superior) officers and inferior officers, except that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

36.    "[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by" the Appointments Clause. *Buckley*, 424 U.S. at 126.

37.    The Appointments Clause is not limited to officials with authority to "enter a final decision" on behalf of the United States; it applies to any official who "exercise[s] significant discretion" in "carrying out . . . important functions." *Freytag v. Comm'r*, 501 U.S. 868, 881–82 (1991).

38.    Rulemaking is a significant authority which may be exercised only by an officer. *Buckley*, 424 U.S. at 140–41.

39.    A person exercising officer powers may be appointed as an inferior officer only if his "work is directed and supervised at some level by others who were appointed by presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1997). It is necessary but "not enough that other officers may be identified who formally maintain a higher rank, or possess responsibilities of a greater magnitude." *Id.* at 662–63. The key question, rather, is "how much power an officer exercises free from control by a superior." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1982 (2021).

40.    Three factors that bear on whether an official wielding officer powers may be appointed as an inferior officer are: (1) whether the officer is subject to oversight in the conduct of his duties; (2) whether the officer is subject to removal without cause; and (3) whether the officer has "no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Edmond*, 520 U.S. at 664–65.

41.    However, if an officer has "the power to render a final decision on behalf of the United States without any . . . review by [a] principal officer in the Executive

Branch," then the officer necessarily must be appointed as a principal officer. *Arthrex*, 141 S. Ct. at 1981 (cleaned up).

42.    The practical result of the Appointments Clause is that officers with more discretion must be appointed by nomination and confirmation, while closely supervised officers with less discretion may be appointed with less scrutiny (if allowed by Congress). Only non-officers—those who lack any significant federal authority—may be selected by other means.

## FACTUAL ALLEGATIONS

### *Hawaiian Spinner Dolphins*

43.    Hawaiian spinner dolphins are relatively small, social dolphins named for their acrobatic aerial displays. The dolphins are not "in danger of extinction or depletion." § 1362(1). To the contrary, "[s]pinner dolphins are common and abundant throughout the entire Hawaiian Archipelago[.]" National Marine Fisheries Service, Final Environmental Impact Statement and Regulatory Impact Review 82 (June 2021).[1]

44.    Spinner dolphins typically hunt in the open ocean at night and return to the Hawaiian Islands to socialize. *Id.* at 85. These daytime activities tend to take place in shallow, nearshore waters, where the dolphins can socialize with each other and with humans, while remaining safe from predators. *Id.* "Upon arrival [to

---

[1] https://media.fisheries.noaa.gov/2021-07/enhancing-protections-for-hawaiian-spinner-dolphins-feis-508.pdf.

nearshore waters], the dolphins exhibit a high degree of social interactions[.]" *Id.* at 86.

45.     After the social time ends, the dolphins spend "four to five hours" resting before returning to open waters to forage again. *Id.* In Oahu, for example, the dolphins' rest hours take place from "midday to late afternoon." *Id.*

### *The Rule*

46.     In August 2016, Mr. Rauch issued a notice of proposed rulemaking. *Protective Regulations for Hawaiian Spinner Dolphins Under the Marine Mammal Protection Act*, 81 Fed. Reg. 57,854 (Aug. 24, 2016). The comment period closed in December 2016. *Swim With and Approach Regulation for Hawaiian Spinner Dolphins Under the Marine Mammal Protection Act*, 86 Fed. Reg. 53,818, 53,822 (Sept. 28, 2021).

47.     On September 28, 2021, Mr. Rauch published the corresponding final rule in the Federal Register. *Id.* at 53,818. The Rule prohibits "swimming with and approaching a Hawaiian spinner dolphin within 50 yards." *Id.*

48.     The Rule was motivated by concern that, when dolphins socialize with humans, the animals use energy that they ought to spend foraging or nurturing their young instead. *Id.* at 53,819.

49.     For example, when dolphins socialize with humans, they more frequently engage in "aerial displays" (such as the leaping and spinning for which spinner dolphins are named), "tail-slapping, [and] other visible behaviors." *Id.* The

dolphins may also expend energy in swimming away from humans when they are not interested in socializing. *Id.*

50.     Because these energy expenditures "can reduce the amount of energy available to forage and care for young," they "could potentially cause negative population-wide impacts." *Id.* Through this speculative chain of "can" and "could" statements, Mr. Rauch concluded that permitting dolphins to socialize with humans "may result in 'take.'" *Id.* at 53,820.

51.     The Rule thus seeks to protect dolphins from their own desire to socialize with humans. To that end, the Rule not only forbids swimmers themselves from approaching spinner dolphins; it also requires swimmers who are "*approached* by a spinner dolphin" to "take[] immediate steps to move away from the animal." *Id.* at 53,841 (emphasis added).

52.     Mr. Rauch justifies the regulation as necessary to stop the "pursuit, torment, or annoyance" of spinner dolphins "which . . . has the potential to . . . caus[e] disruption of behavioral patterns." 86 Fed. Reg. at 53,821, 53,823. Nevertheless, he admits that "there is not clear evidence of population decline or adverse biological impacts." *Id.* at 53,824.

## DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

53.     Each Plaintiff has a significant interest in whether the Rule was lawfully promulgated. Eliza is unable to help her psychotherapy patients to her fullest ability. The incomes of Shelley's company and Lisa's business have been substantially reduced. And Lisa's trauma-survivor nonprofit is no longer able to offer

dolphin encounters to its participants. Further, the Rule has reduced the value of Shelley's boating permit.

54.     The Rule thus visits significant financial and professional hardship on Plaintiffs.

55.     A decision declaring the Rule to be inconsistent with the Appointments Clause would remedy these injuries by restoring Plaintiffs' ability to resume their dolphin-related work, and by preserving the value of Plaintiffs' assets.

56.     Each Plaintiff also has a significant interest in whether rulemaking power was lawfully delegated to the Deputy Assistant Administrator for Regulatory Programs and to the Assistant Administrator. The Rule was promulgated pursuant to those delegated powers, and the DAARP continues to exercise rulemaking powers over Plaintiffs. Being subject to the power of an unconstitutionally serving official inflicts a present injury on Plaintiffs. Furthermore, at least one regulation that was proposed by the DAARP and that will injure Plaintiffs is currently pending. *See Establishment of Time-Area Closures for Hawaiian Spinner Dolphins Under the Marine Mammal Protection Act*, 86 Fed. Reg. 53,844 (Sept. 28, 2021) (notice of proposed rulemaking issued by Mr. Rauch).

57.     Plaintiffs have no plain, speedy, and adequate remedy at law for their injuries. Money damages in this case are not available.

58.     This case is currently justiciable because the Rule went into effect on October 28, 2021, 86 Fed. Reg. at 53,818, and the delegations empowering the DAARP and the Assistant Administrator continue to be in effect.

59.     Therefore, declaratory and injunctive relief are appropriate to resolve this controversy.

## FIRST CLAIM FOR RELIEF

### *Adoption of a Final Rule by a Person Not Appointed as an Officer*
### (U.S. Const. art. II, § 2, cl. 2; 5 U.S.C. § 706(2)(B))

60.     The preceding paragraphs are incorporated herein by reference.

61.     The Administrative Procedure Act subjects to judicial review final agency actions that are contrary to the Constitution. 5 U.S.C. §§ 704, 706. The issuance of a final rule is a final agency action.

62.     As the DAARP, Mr. Rauch wields power reserved for officers of the United States because he exercises significant powers pursuant to the laws of the United States, including but not limited to rulemaking powers. Agency delegations empower him to "sign[] . . . material for publication in the Federal Register and the Code of Federal Regulations." National Oceanic & Atmospheric Administration, U.S. Department of Commerce, NOAA Organizational Handbook: Transmittal No. 61, at PDF 5 (2015), https://bit.ly/3k9XRlj.

63.     Yet, Mr. Rauch was hired as a career civil servant, not an accountable officer appointed pursuant to the Appointments Clause. He therefore served and continues to serve in contravention of the Appointments Clause, and his adoption of the final rule was contrary to the Constitution.

*Unlawful Principal Officer*

64.    The DAARP must be appointed as a principal officer because he is not effectively supervised by anyone who is appointed by the President with the advice and consent of the Senate.

65.    First, as a career member of the Senior Executive Service, the DAARP may not be removed from the Senior Executive Service except for cause, 5 U.S.C. §§ 7541–43, and in certain circumstances he cannot be reassigned within the Senior Executive Service without his consent, 5 C.F.R. § 317.901. Second, because the DAARP has the delegated authority to issue rules, he is empowered to make "final decision[s] on behalf of the United States." *Edmond*, 520 U.S. at 665. The DAARP's approval of a rule does not require the concurrence of another official. *Compare* National Oceanic & Atmospheric Administration, U.S. Department of Commerce, NOAA Organizational Handbook: Transmittal No. 61, at PDF 5 (2015) (delegation of rulemaking power to DAARP), https://bit.ly/3k9XRlj, *with id.* at PDF 8 (requiring the Assistant Administrator be advised before action is taken on certain delegated responsibilities). Third, the DAARP is overseen, if at all, by the Assistant Administrator, who is not a Senate-confirmed appointee. The DAARP therefore must be appointed as a principal officer.

66.    Additionally, since the DAARP is empowered to issue regulations without the concurrence of other officials, he can commit the federal government to a final regulatory action, which cannot be reversed without a new regulatory action. For that separate reason, he must be appointed as a principal officer.

67.     Despite the DAARP's discretion and independence, he is not nominated by the President and confirmed by the Senate. He therefore exercises his powers unconstitutionally.

*Unlawful Inferior Officer*

68.     Even if the DAARP need only be appointed as an inferior officer, such appointment has not taken place, and he therefore exercises his powers unconstitutionally.

69.     The default appointment procedure for inferior officers is presidential appointment with Senate confirmation. *Edmond*, 520 U.S. at 660.

70.     The Constitution permits Congress to loosen this requirement within strict limits: Congress may only vest the appointment of inferior officers in the President, the courts of law, or the heads of departments; and Congress must do so "by law." U.S. Const. art. II, § 2, cl. 2.

71.     On information and belief, the DAARP is not appointed by the President, a court of law, or a head of department. Rather, as a career civil servant, Mr. Rauch was hired by the civil service's merit staffing process—that is, he was identified by an Executive Resources Board (or the delegate of the Board) as amongst the most qualified applicants on non-political criteria, selected by the hiring authority from those most qualified applicants, and approved as qualified by a board assembled by the Office of Personnel Management. *See* 5 C.F.R. §§ 317.501, 317.502. On information and belief, the hiring authority for Mr. Rauch was not the President, a court of law, or a head of department.

72.    Moreover, Congress has not provided for the DAARP's position by law and so it necessarily has not, by law, vested the DAARP's appointment in the President, a court of law, or a head of department.

73.    The DAARP therefore exercises his powers unconstitutionally even if he need only be appointed as an inferior officer.

### In the Alternative—Unconstitutional Action by the Assistant Administrator

74.    The DAARP was empowered to adopt the Rule without the concurrence of other officials and was responsible for doing so. Nevertheless, assuming the Assistant Administrator also approved the Rule as issued, the Rule still must be vacated.

75.    The Assistant Administrator has been delegated wide, unreviewable discretion to exercise the Secretary's powers across a broad range of statutes. She therefore must be appointed as a principal officer. Nevertheless, she is not nominated by the President and confirmed by the Senate, and she therefore holds her office unconstitutionally and any approval of the Rule was thus in violation of the Appointments Clause and ineffective.

\*    \*    \*

76.    The Rule is thus contrary to constitutional right, power, privilege, or immunity. 5 U.S.C. § 706(2)(B).

### SECOND CLAIM FOR RELIEF

### Delegation of Rulemaking Authority
### to a Person Not Appointed as an Officer
### (U.S. Const. art. II, § 2, cl. 2; 5 U.S.C. § 706(2)(B))

77.    The preceding paragraphs are incorporated herein by reference.

78.    The Administrative Procedure Act ("APA") subjects to judicial review "[a] preliminary, procedural, or intermediate agency action" that is contrary to the Constitution. 5 U.S.C. §§ 704, 706. Such actions are subject to review on the review of a final agency action. *Id.* § 704. The NOAA Administrator's delegation of rulemaking authority under the Act to the NMFS Assistant Administrator is a preliminary, procedural, or intermediate agency action preceding the issuance of the final rule. And the NMFS Assistant Administrator's delegation of rulemaking authority under the Act to the NMFS Deputy Assistant Administrator for Regulatory Programs is likewise a preliminary, procedural, or intermediate agency action preceding the issuance of the final rule.

79.    Although the APA conditioned Plaintiffs' challenge to the delegations on the issuance of a final agency action like the final rule, Plaintiffs' harm from the delegations is not limited to that embodied in the Rule. Being subjected to the rulemaking authority of an unconstitutionally serving DAARP is itself a present, ongoing harm. Furthermore, as the DAARP, Mr. Rauch is poised to approve and promulgate further regulations that will injure Plaintiffs. *See, e.g.*, *Establishment of Time-Area Closures for Hawaiian Spinner Dolphins Under the Marine Mammal Protection Act*, 86 Fed. Reg. 53,844 (Sept. 28, 2021) (notice of proposed rulemaking issued by Mr. Rauch).

80.    For the reasons stated in the First Claim for Relief, final rulemaking authority may be entrusted only to properly appointed principal officers, consistent

with the Appointments Clause. Thus, delegating such authority to an official not so appointed violates the Appointments Clause.

81.    As neither the Assistant Administrator nor the DAARP are appointed as principal officers, the NOAA Administrator's delegation of rulemaking authority to the Assistant Administrator is unconstitutional, as is the Assistant Administrator's further delegation to the DAARP. And even supposing rulemaking authority may be delegated to an inferior officer, the DAARP was not appointed as an inferior officer.

82.    The delegations are thus contrary to constitutional right, power, privilege, or immunity. 5 U.S.C. § 706(2)(B).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for relief as follows:

1.    As to the First Claim for Relief, a judgment declaring that the Rule violates the Appointments Clause;

2.    As to the First Claim for Relief, a permanent prohibitory injunction setting aside the Rule and forbidding Defendants from enforcing it, because it violates the Appointments Clause;

3.    As to the Second Claim for Relief, a judgment declaring that the delegations of rulemaking authority from the NOAA Administrator to the Assistant Administrator, and from the Assistant Administrator to the Deputy Assistant Administrator for Regulatory Programs, violate the Appointments Clause;

4.    As to the Second Claim for Relief, a permanent prohibitory injunction

setting aside the above delegations of rulemaking authority, because they violate the Appointments Clause;

5.    An award of reasonable attorney fees and costs, pursuant to 28 U.S.C. § 2412, or any other applicable authority; and

6.    Any other relief that the Court deems just and proper.


Dated: March 21, 2022.

Respectfully submitted:

/s/ Glenn E. Roper

MICHAEL A. POON*                    GLENN E. ROPER, D. Md. No. 21382
Cal. Bar No. 320156                 Pacific Legal Foundation
DAMIEN M. SCHIFF*                   1745 Shea Center Drive, Suite 400
Cal. Bar No. 235101                 Highlands Ranch, Colorado 80129
Pacific Legal Foundation            Telephone: (916) 503-9045
555 Capitol Mall, Suite 1290        GERoper@pacificlegal.org
Sacramento, California 95814
Telephone: (916) 419-7111
MPoon@pacificlegal.org
DSchiff@pacificlegal.org

*Pro Hac Vice Pending
                    Counsel for Plaintiffs